## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8700
Washington, DC 20530

                             *Plaintiff,*

    v.

WESTINGHOUSE AIR BRAKE
TECHNOLOGIES CORP.
1001 Airbrake Avenue
Wilmerding, PA 15148

FAIVELEY TRANSPORT S.A.
Le Delage Building
Hall Parc - Bâtiment 6A
6ème étage
3, rue  du 19 mars 1962
92230 Gennevilliers
CEDEX – France

and

FAIVELEY TRANSPORT NORTH AMERICA
50 Beachtree Boulevard
Greenville, SC 29605

                           *Defendants.*

## **COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the

United States, brings this civil antitrust action to enjoin the proposed acquisition of Faiveley

Transport S.A. and Faiveley Transport North America (collectively, "Faiveley") by

Westinghouse Air Brake Technologies Corporation ("Wabtec") and to obtain other equitable relief. The United Sates alleges as follows:

## I. INTRODUCTION

1.      Wabtec proposes to acquire Faiveley, a global provider of railway brake equipment components that make up a critical system intimately linked to both the performance and safety of trains. Faiveley produces its brake system components in the United States through its subsidiary, Faiveley Transport North America. Wabtec is a leading manufacturer of rail equipment used in the assembly of freight cars built for use in the U.S. freight rail network. For purchasers of components of freight car brake systems, Wabtec and Faiveley are two of the top three suppliers approved by the Association of American Railroads ("AAR"), with combined market shares ranging from approximately 41 to 96 percent for many of the products in which they compete. Where a product must be AAR approved, customers must source it from an AAR-approved supplier of that product.

2.      In 2010, Faiveley entered into a joint venture with Amsted Rail Company, Inc. ("Amsted"), a rail equipment supplier based in Chicago, Illinois, to form Amsted Rail Faiveley LLC ("ARF"). Faiveley owns 67.5 percent of ARF and Amsted owns the remaining 32.5 percent interest in the joint venture. As part of the joint venture, all of the freight car brake system components that are manufactured by Faiveley Transport North America are marketed and sold to customers by Amsted. Amsted and Faiveley do not compete for the sale of brake system components. Critically, the joint venture allows Faiveley to bundle brake components with Amsted's other products such as wheels and axles, thereby increasing its ability to compete for the sale of freight car brake system components.

3.      Wabtec's proposed acquisition of Faiveley would eliminate head-to-head competition in the development, manufacture, and sale of several components of freight car brake systems in the United States.  The proposed acquisition likely would give Wabtec the incentive and ability to raise prices or decrease the quality of service provided to customers in the railroad freight industry.  The proposed acquisition also would eliminate future competition for control valves, the most safety-critical component on a freight car.  If approved, the proposed acquisition would eliminate the entry of Faiveley into this market, thus maintaining a century-old duopoly between Wabtec and its only other control valve rival, and reducing the two incumbent control valve suppliers' incentive to compete.

4.      Accordingly, the proposed acquisition likely would substantially lessen existing and future competition in the development, manufacture, and sale of freight car brake system components in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.  JURISDICTION AND VENUE

5.      The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

6.      Defendants manufacture and sell components of freight car brake systems throughout the United States.  They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their activities in the development, manufacture, and sale of rail equipment have had a substantial effect upon interstate commerce.  The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.      Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §

22 and 28 U.S.C. § 1391(c).  Defendants have consented to venue and personal jurisdiction in the

District of Columbia.

### III.  DEFENDANTS AND THE PROPOSED ACQUISITION

8.      Wabtec is a Delaware corporation headquartered in Wilmerding, Pennsylvania.  It

is one of the world's largest providers of rail equipment and services with global sales of $3.3

billion in 2015.  Wabtec makes and sells rail equipment, including braking equipment, for a

variety of different end uses, including the railroad freight industry.  In 2015, Wabtec's annual

worldwide sales of freight rail equipment were approximately $2 billion.

9.      Faiveley Transport North America is a New York corporation headquartered in

Greenville, South Carolina.  Faiveley makes and sells rail equipment, including braking

equipment, for a variety of end uses to customers in 24 countries, including the United States.  In

particular, it manufactures products used in freight rail applications.  During the fiscal year

beginning April 1, 2015 and ending March 31, 2016, Faiveley had global sales of approximately

€1.1 billion, with approximately $174 million of revenue in the United States.  Faiveley has

manufacturing facilities in Europe, Asia, and North America, including six U.S. locations.

Faiveley Transport North America is a wholly-owned subsidiary of defendant Faiveley Transport

S.A., a société anonyme based in Gennevilliers, France.

10.     On July 27, 2015, Wabtec entered into an Exclusivity Agreement with Faiveley

whereby it made an irrevocable offer to acquire Faiveley, for cash and stock totaling

approximately $1.8 billion, including assumed debt.  The proposed acquisition would create the

world's largest rail equipment supplier with expected revenue of approximately $4.5 billion per

year and a presence in every key rail market in the world.

## IV.  TRADE AND COMMERCE

A.      **Industry Overview**

11.      Rail freight transport is the use of railroads and freight trains to transport cargo.
A freight train is a group of freight cars hauled by one or more locomotives on a railway.  A
typical freight locomotive can haul as many as 25 to 100 freight cars.

12.      The railroad freight industry plays a significant role in the U.S. economy, hauling
key commodities such as energy products, automobiles, construction materials, chemicals, coal,
petroleum, equipment, food, metals, and minerals.  The U.S. freight rail network accounts for
approximately 40 percent of the distance all freight shipments of commodity goods travel in the
United States.  The U.S. freight rail network is one of the most developed rail networks in the
world and it supports approximately $60 billion in railroad freight shipments each year.  This
freight network consists of 140,000 miles of trackage owned and operated by seven Class I
Railroads (as identified by the U.S. Department of Transportation), 21 regional railroads, and
510 local railroads.

13.      Railroads and freight car leasing companies purchase new freight cars from car
builders.  Car builders build the body of the freight car and are responsible for sourcing and
integrating all of the components needed for the various sub-systems required to assemble a
functioning freight car.  The most important sub-system is the safety critical brake system.
Manufacturers of brake systems and brake system components sell their components and systems
to car builders for new freight cars and directly to railroads and leasing companies for
aftermarket maintenance of cars.  Railroads and freight car leasing companies collectively
purchase and maintain approximately 1.5 million freight cars utilized throughout the U.S. freight
rail network.  Freight railroads in the United States spend over $20 billion annually to acquire

new freight cars and maintain existing freight car fleets.  Freight car maintenance is critical for the safety and performance of a freight train.

**B.**   **Railroad Freight Industry Regulation**

14.      Freight cars often must travel over multiple railroads' trackage in order to deliver commodities throughout the United States.  Traveling over multiple lines requires freight car equipment to be mechanically interoperable and meet performance standards for certain types of rail equipment.  In order for the brake systems on individual freight cars to work together properly, freight car brake systems must be comprised of industry-approved components and meet critical performance standards.

15.      The Federal Railroad Administration of the U.S. Department of Transportation establishes strict standards to ensure interoperability of freight cars in use within the U.S. freight rail network.  These standards require that certain freight car components achieve common performance and interoperability standards.  For certain freight rail equipment, including freight car brake systems, the AAR is responsible for setting technical and performance standards.  The AAR is a policy- and standard-setting organization comprised of full, affiliate, and associate members.  Full members include the Class I railroads.  Affiliate and associate members include rail equipment suppliers and freight car owners.

16.      AAR's functions include technical and mechanical standard setting for freight rail equipment.  The AAR manages fifteen technical committees comprised of select employees of full, affiliate, and associate members.  These committees write technical and performance standards for components used on freight trains.  They also approve products for use within the U.S. freight rail network.  Thus, a component manufacturer like Wabtec or Faiveley must have AAR approval for many significant components of a freight train before its products can be used

in the United States.  The length and difficulty of the AAR-approval process depends on the nature and function of the train component.  Brake components face some of the lengthiest and most rigorous testing and approval processes because brakes are safety-critical components that must be fail-safe.  The Brake Systems Committee of the AAR oversees the review and performance testing of brake equipment and it awards incremental approvals over time before a component can earn unconditional approval.

17.     Freight car owners and operators view AAR approval as a critical certification. Industry participants view AAR approval as a high barrier to selling freight car brake systems and components in the United States.

**C.     Freight Car Brake Equipment Purchases**

18.     On average, there are expected to be approximately 75,000 new freight car builds per year in the United States.  Demand for new cars is tied to macroeconomic conditions, including demand for the commodities that freight cars carry.  In recent years demand for freight cars has ranged from approximately 63,000 to 81,000 new car builds per year.  Railroads and freight car leasing companies typically issue requests for proposals to freight car builders who compete to provide complete freight cars built to specification.  Freight car builders source sub-systems and components from suppliers, like Wabtec and Faiveley.  Where a product must be AAR approved, car builders must source it from an AAR-approved supplier of that product.  For certain components of a freight car brake system, Wabtec and Faiveley are two of the only three AAR-approved suppliers.

19.     New freight car procurements typically include performance specifications identified by customers.  Freight car builders use these specifications to source and price particular components for the procurement.  Inclusion in new car procurements also becomes a

source for long-term revenues for component suppliers.  Incumbent suppliers for many freight

car brake system components enjoy an advantage in the aftermarket.  Although components are

technically interoperable, changing suppliers often introduces at least some switching costs and

increased risk of failure for end-use customers.  Thus, competitiveness for original equipment

sales is critical.

20.     Customers can purchase freight car brake equipment on a component-by-

component basis.  However, a large rail equipment supplier will typically offer better pricing to

customers who purchase multiple freight car brake system components together as a bundle.  For

example, rail equipment suppliers will offer more competitive pricing to customers who

purchase all the components for an entire freight car brake system rather than piecemeal

purchases of certain components.  Because product bundles may span multiple systems on a

freight train, suppliers with broad offerings often have a competitive advantage over niche

suppliers.

## V.   RELEVANT MARKETS

21.     Defendants compete across a range of freight car brake system components, many

of which require AAR approval.  Each product described below constitutes a line of commerce

under Section 7 of the Clayton Act, 15 U.S.C. § 18, and each is a relevant product market in

which competitive effects can be assessed.  They are recognized in the railroad freight industry

as separate product lines, they have unique characteristics and uses, they have customers that rely

specifically on these products, they are distinctly priced, and they have specialized vendors.

22.     Mergers and acquisitions that reduce the number of competitors in already

concentrated markets are more likely to substantially lessen competition.  Concentration can be

measured in various ways, including by market shares and by the widely-used Herfindahl-

Hirschman Index ("HHI").  *See* Appendix.  Under the *Horizontal Merger Guidelines*, post-acquisition HHIs above 2500 and changes in HHI above 200 trigger a presumption that a proposed acquisition is likely to enhance market power and substantially lessen competition in a defined market.  Given the high pre- and post-acquisition concentration levels in the relevant markets described below, Wabtec's proposed acquisition of Faiveley presumptively violates Section 7 of the Clayton Act.  In almost all of these markets, customers would face a duopoly after the acquisition.

## A.    Relevant Market 1:  Hand Brakes

23.    A hand brake is a manual wheel located at the end of a freight car that, when turned, can engage a freight car's brake system without using pneumatic or hydraulic pressure. It is a secondary means to prevent a freight car from moving, for example, during maintenance or when being connected to a new locomotive.

24.    The market for the development, manufacture, and sale of freight car hand brakes is already concentrated.  Wabtec and Faiveley together hold approximately 60 percent of this market based on the quantity of hand brakes sold.  Their only significant competitor holds most of the remaining share of the hand brakes market.  A fourth, marginal competitor sells a negligible quantity of hand brakes each year.  Further, this competitor does not manufacture any other significant components of a freight car brake system nor is it likely to begin doing so in the foreseeable future.  Thus, it is unlikely to replace the competition that would be lost as a result of the proposed acquisition.

25.    In the U.S. market for the development, manufacture, and sale of freight car hand brakes, the pre-acquisition HHI is 3,500.  The post-acquisition HHI would be in excess of 5,000,

with an increase in HHI in excess of 1,500.  Thus, this market is highly concentrated and would become significantly more concentrated as a result of the proposed acquisition.

**B.**      **Relevant Market 2:  Slack Adjusters**

26.      A slack adjuster is a pneumatically-driven "arm" that applies pressure to the brake shoe (a friction material) in order to change the brake shoe's position relative to the train's wheel.  As the brake shoe wears down, this adjustment in position maintains the brake systems' ability to apply the correct amount of braking force by ensuring the brake shoe is applied appropriately to the wheel to achieve optimal braking capability.

27.      Combined, Wabtec and Faiveley have approximately 76 percent of this market based on quantity sold.  Their only significant competitor has a market share of approximately 24 percent, thereby making the proposed acquisition a virtual merger-to-duopoly in the market for the development, manufacture, and sale of slack adjusters.  The proposed acquisition threatens to further concentrate this market, as evidenced by the pre- and post-merger HHIs.  The post-acquisition HHI would be approximately 6,300, reflecting an increase of approximately 2,800 as a result of the acquisition.

**C.**      **Relevant Market 3:  Truck-Mounted Brake Assemblies**

28.      Freight car braking equipment is often mounted under the bogie (e.g., car), thereby serving as the foundation for the wheels.  Truck-mounted brake assemblies ("TMBs"), however, are an approach to mounting the brakes on freight car designs for which body-mounted brakes are not suitable.  TMBs are free standing equipment that do not require additional rigging and so are significantly lighter than their bogie counterparts.  They are commonly used for special lightweight or low profile freight car designs.

29.     Post-acquisition, the market for the development, manufacture, and sale of TMBs would be highly concentrated.  Combined, Wabtec and Faiveley have approximately a 96 percent share of the market based on quantity sold.   The post-acquisition HHI of the merged firm would be approximately 9,200, with an increase of approximately 3,600 resulting from the acquisition.

**D.     Relevant Market 4:  Empty Load Devices**

30.     Empty load devices are incorporated into every freight car and detect when a freight car is empty.  The empty load device relays this information to the brake system control board, which is then able to reduce the amount of braking force applied to the brakes on a freight car that is empty so that it decelerates in concert with the remainder of the freight cars in tow.

31.     Post acquisition, the market for the development, manufacture, and sale of empty load devices would be highly concentrated.  Combined, Wabtec and Faiveley have a 60 percent share of the market based on quantity sold.   The post-acquisition HHI of the merged firm would be approximately 5,100, with an increase of approximately 1,700 resulting from the acquisition.

**E.     Relevant Market 5:  Brake Cylinders**

32.     A brake cylinder is a component of a freight car brake system that converts compressed air into mechanical force to apply the brake shoe to the wheel in order to decelerate or stop o the train.

33.      Post-acquisition, the market for the development, manufacture, and sale of brake cylinders would be highly concentrated.  Combined, Wabtec and Faiveley have approximately a 41 percent share of the market based on quantity sold.   The post-acquisition HHI of the merged firm would be approximately 5,100 with an increase of approximately 800 resulting from the acquisition.

**F.**     **Relevant Market 6:  Control Valve and Co-Valves**

34.     Modern trains rely upon a fail-safe air (or pneumatic) brake system that uses changes in air pressure to signal each freight car to release its brakes.  A reduction or loss of air pressure applies the brakes using the compressed air in the air reservoir.  An increase in air pressure decreases the braking force applied until it is released.  The control valve, often described as the brain of a freight car's brake system, regulates the flow of air to engage or disengage the brakes.

35.     A control valve is the most highly-engineered, technologically-sophisticated component in a freight car brake system.  Without it, a supplier cannot offer a complete freight car brake system.  The development of a control valve also requires significant development time and financial resources.  In addition, it faces one of the railroad freight industry's lengthiest and most rigorous testing and approval processes.

36.     The market for the development, manufacture, and sale of control valves is characterized by a century-old duopoly between Wabtec and another manufacturer.  Over the past five years, Wabtec had approximately 40 percent of the U.S. control valve market and its rival had the other 60 percent of the market.

37.     On June 29, 2016, Faiveley obtained conditional approval from the AAR to sell a control valve.  In doing so, it disrupted the duopoly by becoming the first firm in over 25 years and only the second firm in the last 50 years to develop a control valve and make substantial progress through the industry's formidable testing and approval process for freight car control valves.  Thus, the proposed acquisition would eliminate a third potential supplier of control valves, and continue a longstanding duopoly for the foreseeable future.

38.     Working closely with the control valve are its complementary valves: the dirt collector, angle cock, and vent valve (collectively, "co-valves").  A dirt collector is a ball style cut-out-cock with a dirt chamber that is installed adjacent to the control valve.  It allows for impurities in the air compressor to be filtered out to keep the air lines feeding the braking system clear of obstructions that would reduce air pressure.  An angle cock is placed at the end of the brake pipe and provides a means for closing the brake pipe at the end of the freight car.  A vent valve is a device on a freight car that reacts to a rapid drop in brake pipe pressure and is used to exhaust air from the brake pipe during emergency brake applications.  For new freight car builds, sales of co-valves correlate with the sale of the control valve.  Customers have a preference for purchasing co-valves and control valves from the same supplier, to which they return for replacement parts in the aftermarket.  While Faiveley currently has insignificant sales of angle cocks, vent valves, and dirt collectors, it is an AAR-approved supplier of these products.

**G.     Geographic Market**

39.     Based on customer location and the governing regulatory framework, the United States is the relevant geographic market for the development, manufacture, and sale of freight brake components.  Wabtec and Faiveley compete with each other for customers located throughout the United States.  When a geographic market is defined based on the location of customers, competitors in the market are firms that sell to customers in the specified region even though some suppliers that sell into the relevant market may be located outside the geographic market.  In addition, before suppliers can sell components of freight car brake systems in the United States, they must first get AAR approval.  The AAR's regulatory authority requires products be certified for interoperability within the U.S. freight rail network.  Because these products are certified for use and sale anywhere in the United States, the regulatory framework

determines which firms can supply the U.S. customer base, which supports a United States geographic market.  Furthermore, suppliers of freight car brake systems and components typically deliver their products and services to customers' locations and are able to price discriminate based on those locations.

40.     In addition, a small but significant increase in price of each of the foregoing components of a freight car brake system sold into the United States would not cause a sufficient number of U.S. customers to turn to providers of freight brake components sold into other countries because those products lack AAR approval and interoperability with U.S. freight rail networks.  Accordingly, the United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

## VI.  ANTICOMPETITIVE EFFECTS

41.     Wabtec and Faiveley presently compete in the development, manufacture, and sale of many components of a freight car brake system, including hand brakes, slack adjusters, empty load devices, TMBs and brake cylinders.  The defendants' combined shares in each of these markets range from approximately 41 to 96 percent.  Therefore, the unilateral competitive effects of the proposed acquisition are presumptively harmful in these product markets under the *Horizontal Merger Guidelines*.  The proposed acquisition likely will result in unilateral effects that substantially lessen competition in the markets for hand brakes, load detection devices, slack adjusters, TMBs, and brake cylinders, respectively.

42.     In each of the foregoing relevant markets, Wabtec and Faiveley presently compete against each other and only one other large competitor.  Prices and other terms of trade are usually determined by negotiations between suppliers and customers.  Products are not highly

differentiated by function or performance, and price is the primary customer consideration given that performance is presumed after approval by the industry's standard-setting body, the AAR.

43.     A merger between two competing sellers reduces the ability of buyers to negotiate better contract terms, including price, by leveraging competing offers.  The loss of customer negotiating power can significantly enhance the ability and incentive of the merged entity to offer less competitive terms.  Customers likely derive significant benefits from having Faiveley in the market today, as reflected by its substantial market shares in the relevant freight brake components identified above.  The resulting loss of a competitor and increased concentration of market share indicate that the acquisition likely will result in significant harm from expected price increases and decreases in quality of service.

44.     When the proposed acquisition was announced, Wabtec and a second manufacturer were the only AAR-approved suppliers of control valves, a duopolistic market they had shared for over a century.

45.     As the second-largest railway brake manufacturer in the world, Faiveley was uniquely positioned to enter the control valve market.  Faiveley had developed a control valve prototype that it intended to shepherd through the AAR's control valve testing and approval process.  If successful, it would have become a third control valve supplier.  But for the merger, Faiveley likely would have entered the control valve market, thereby invigorating competition between Wabtec and its only competitor in the control valve market.  The entry of a third supplier of control valves likely would increase competition and allow customers to negotiate better prices and terms.

46.     Faiveley's entry into the control valve market would pose an immediate threat to the incumbent suppliers, forcing them to compete aggressively or risk losing a sale to Faiveley.

Faiveley's customers anticipate it would offer price competition in order to gain quick acceptance of its control valve. As a result, Faiveley likely would have had a substantial impact on pricing, service and other commercial terms offered by the incumbent suppliers, even with a small initial share of actual sales. Therefore, the proposed acquisition is likely to result in anticompetitive unilateral effects in the market for control valves.

## VII.  ENTRY

47.     Given the substantial time required to develop and qualify a component of a freight car brake system, timely and sufficient entry by other competitors into any of the relevant markets is unlikely to mitigate the harmful effects of the proposed acquisition.

48.     The likelihood of another potential entrant in the control valve market is even more remote given the historical dearth of meaningful attempts to enter this market, as well as the substantial time and cost associated with entry into the control valve market.

## VIII.  VIOLATION ALLEGED

49.     The acquisition of Faiveley by Wabtec likely would substantially lessen competition in each of the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

50.     Unless enjoined, the acquisition likely would have the following anticompetitive effects, among others:

(a)     actual and potential competition between Wabtec and Faiveley in the relevant markets would be eliminated;

(b)     competition generally in the relevant markets would be eliminated; and

(c)     prices and commercial terms for the relevant products would be less favorable, and quality and service relating to these products likely would decline.

## IX.  REQUEST FOR RELIEF

51.     The United States requests that this Court:

(a)      adjudge and decree Wabtec's proposed acquisition of Faiveley to be unlawful and in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)      preliminarily and permanently enjoin and restrain defendants and all persons acting on their behalf from consummating Wabtec's proposed acquisition or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Faiveley with the operations of Wabtec;

(c)      award the United States its costs of this action; and

(d)     award the United States such other relief as the Court deems just and

proper.

Dated: October 26, 2016


Respectfully submitted,

FOR PLAINTIFF UNITED STATES:


RENATA B. HESSE (D.C. Bar #466107)
Acting Assistant Attorney General
Antitrust Division

SONIA K. PFAFFENROTH
Deputy Assistant Attorney General
Antitrust Division

PATRICIA A. BRINK
Director of Civil Enforcement
Antitrust Division

MARIBETH PETRIZZI (D.C. Bar #435204)
Chief, Litigation II Section
Antitrust Division

STEPHANIE A. FLEMING
Assistant Chief, Litigation II Section
Antitrust Division

DOHA MEKKI*
James K. Foster, Jr.
Erin C. Grace
Daniel J. Monahan
Suzanne Morris
  Trial Attorneys

United States Department of Justice
Antitrust Division, Litigation II Section
450 Fifth Street N.W., Suite 8700
Washington, D.C. 20530
Telephone: (202) 598-8023
Facsimile: (202) 514-9033
doha.mekki@usdoj.gov


*LEAD ATTORNEY TO BE NOTICED

## APPENDIX

### Herfindahl-Hirschman Index

The Herfindahl-Hirschman Index ("HHI") is a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the relevant market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size, and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

## CERTIFICATE OF SERVICE

I, Doha Mekki, hereby certify that on October 26, 2016, I caused a copy of the foregoing Complaint to be served upon defendants Westinghouse Air Brake Technologies Corp., Faiveley Transport S.A., and Faiveley Transport North America by mailing the documents electronically to their duly authorized legal representatives as follows:

Defendant Westinghouse Air Brake Technologies Corp.
Craig A. Waldman, Esq.
Jones Day
555 California Street
San Francisco, CA 94104-1500
(415) 875-5765
cwaldman@jonesday.com

Defendants Faiveley Transport S.A. and Faiveley Transport North America
Ilene Knable Gotts, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
(212) 403-1247
ikgotts@wlrk.com

_____
DOHA MEKKI
Trial Attorney, Litigation II Section
United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 8700
Washington, D.C. 20530
Telephone: (202) 598-8023
Facsimile: (202) 514-9033
doha.mekki@usdoj.gov